RECORD NO. 14-1608

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

ANDREW ADAMS,

*Plaintiff - Appellant,*

v.

ANNE ARUNDEL COUNTY PUBLIC SCHOOLS,

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**OPENING BRIEF OF APPELLANT
ANDREW ADAMS**

Joyce E. Smithey
RIFKIN, WEINER, LIVINGSTON,
LEVITAN & SILVER, LLC
225 Duke of Gloucester Street
Annapolis, Maryland 21401
410-269-5066
jsmithey@rwlls.com

*Counsel for Appellant*                    October 14, 2014
*Andrew Adams*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1608__      Caption: __Andrew Adams v. Anne Arundel County Public Schools_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Andrew Adams_____
(name of party/amicus)

_____

 who is _____Plaintiff-Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                           ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Joyce E. Smithey                    Date: _____ July 3, 2014 _____

Counsel for: Plaintiff-Appellant

# CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____ July 3, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Joyce E. Smithey                              July 3, 2014
        (signature)                                  (date)

- 2 -

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ..................................................................................iv

I.     JURISDICTIONAL STATEMENT ...............................................................1

II.    ISSUES PRESENTED FOR REVIEW ..........................................................1

III.   STATEMENT OF THE CASE ......................................................................2

    A.    Relevant Facts .......................................................................................2

        1.    Mr. Adams Has a Long History of Satisfactory and
              Exemplary Work Performance.....................................................2

        2.    AACPS' Investigates an Incident Involving Mr. Adams and
              a Student on January 19, 2010 .....................................................3

        3.    On February 25, 2010, Mr. Adams Takes His First Medical
              Leave for a Chronic Medical Condition ........................................8

        4.    On March 3, 2010, Immediately After Mr. Adams Returns
              from FMLA Leave, Mr. Adams' Supervisor (Mr. Farrare)
              Verbally Attacks Him and AACPS "Continues" its
              Investigation Concerning the January 19, 2010, Incident .............8

        5.    On March 3, 2010, Mr. Adams Takes His Second Medical
              Leave ..........................................................................................10

        6.    On March 8, 2010, Mr. Farrare Verbally Attacks Mr.
              Adams Again – Immediately After Mr. Adams Returns
              from His Second Medical Leave...................................................11

        7.    On March 22, 2010, Mr. Adams Takes His Third Medical
              Leave ..........................................................................................12

8.    On March 29, 2010, Dr. Adler Recommends Reassignment as an Accommodation for Mr. Adams' Disability.......................12

9.    On April 12, 2010, AACPS Orders Mr. Adams to Attend a Pre-Discipline Conference During His Medical Leave ...............13

10.    On May 24, 2010, while Mr. Adams is on FMLA Leave, AACPS Issues Mr. Adams a Written Letter of Reprimand Concerning the Previously Resolved Incident of January 19, 2010 ...........................................................................................14

11.    AACPS Subjects Mr. Adams to Unnecessary Medical Examinations During his FMLA Leave.........................................16

12.    AACPS' Doctor Recommends Reassignment as an Accommodation ...........................................................................17

13.    AACPS Reassigns Mr. Adams to a Higher-Stress, Lower-Paying School....................................................................17

B.    Procedural History.................................................................19

IV.    SUMMARY OF ARGUMENT.......................................................22

V.    ARGUMENT.................................................................................23

A.    Standard of Review ...............................................................23

B.    The District Court's Order Granting Summary Judgment with Respect to the Claims in Count I was in Error.......................24

1.    There are Triable Facts Showing AACPS Violated Mr. Adams' Rights under the FMLA .................................24

a.    There are Sufficient Facts in Evidence to Show that Appellee Interfered with Mr. Adams' Rights under the FMLA, as Alleged in Count I ........................................28

b.    There are Triable Facts in Evidence to Show that Appellee Retaliated Against Mr. Adams for Asserting His Rights under the FMLA, as Alleged in Count I ........... 36

C.    The District Court's Order Granting Summary Judgment with Respect to the Claims in Count II and IV was in Error ......................... 41

1.    There are Triable Facts Capable of Proving AACPS Discriminated Against Mr. Adams based on his Disability, as Alleged in Counts II and IV of the Second Amended Complaint .................................................................. 41

2.    The District Court Erred by Not Properly Considering AACPS' Failure to Accommodate Mr. Adams' Known Disability .................................................................... 45

3.    There are Triable Facts Capable of Proving AACPS Retaliated Against Mr. Adams based on his Disability, as Alleged in Counts II and IV of the Second Amended Complaint .................................................................. 50

VI.    CONCLUSION ................................................................... 50

CERTIFICATE OF COMPLIANCE ....................................... 51

CERTIFICATE OF SERVICE ............................................. 52

# TABLE OF AUTHORITIES

## CASES

Page

*Ainsworth v. Loudon County School Board*,
851 F. Supp. 2d 963 (D.E.Va. 2012) ............................................................36

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................24, 42

*Arban v. W. Public Corp.*,
345 F.3d 390 (6th Cir. 2003) ...........................................................32

*Bayer v. United States Department of the Treasury*,
956 F.2d 330 (D.C. Cir. 1992)..........................................................42

*Bosse v. Balt. Cnt'y.*,
692 F. Supp. 2d 574 (D. Md. 2010)........................25, 27-30, 32, 34-36, 38, 40

*Brockman v. Snow*,
217 Fed. Appx. 201 (4th Cir. 2006) ..................................................50

*Burlington N. & Santa Fe Railway v. White*,
548 U.S. 53, 126 S. Ct. 2405 (2006) ......................................36, 37, 50

*Campbell v. Prince George's County*,
2001 U.S. Dist. LEXIS 211 (D. Md. Jan. 4, 2001)............................44

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................23

*Chauncey v. Life Cycle Engineering Inc.*, 2013 U.S. Dist. LEXIS 140579,
2013 WL 5468237 (D.S.C. Sept. 30, 2013) ................................31, 32

*Clark County Sch. District v. Breeden*,
532 U.S. 268, 121 S. Ct. 1508 (2001) .......................................37, 40

*Cones v. Shalala*,
199 F.3d 512 (D.C. Cir. 2000)..........................................................37

*Coszalter v. City of Salem*,
    320 F.3d 968 (9th Cir. 2003) ..........................................................................38

*Coursey v. University of Md. E. Shore*,
    2014 U.S. App. LEXIS 12407 (4th Cir. Md. July 1, 2014)............................45

*Darveau v. Detecon*,
    515 F.3d 334 (4th Cir. 2008) ..........................................................................37

*Daughety v. Harvey*,
    2006 U.S. Dist. LEXIS 98805 (D. Md. June 14, 2006)............................32, 34

*Davidson-Nadwodny*,
    2010 U.S. Dist. LEXIS 29165 (D. Md. Mar. 26, 2010) ..................................37

*Edmonson v. Potter*,
    118 F. App'x 726 (4th Cir. 2004).....................................................................41

*EEOC v. Federal Express Corp.*,
    513 F.3d 360 (4th Cir. 2008) ..........................................................................45

*Fink v. Richmond*,
    2009 U.S. Dist. LEXIS 89853 (D. Md. Sept. 29, 2009)..................................46

*Glunt v. GES Exposition Services, Inc.*,
    123 F. Supp. 2d 847 (D. Md. 2000)..............................................28, 29, 36, 38

*Jeffers v. Thompson*,
    264 F. Supp. 2d 314 (D. Md. 2003)...........................................................32, 34

*Kallenberg v. Knox County Board of Education*,
    2008 U.S. Dist. LEXIS 89645 (E.D. Tenn. Aug. 12, 2008)............................39

*King v. Preferred Technical Group*,
    166 F.3d 887 (7th Cir. 1999) ..........................................................................29

*Klaiber v. Rinaldi*,
    2001 U.S. Dist. LEXIS 23964, 2001 WL. 1860963 (M.D.N.C. Feb. 12,
    2001) ................................................................................................................29

*Krenzke v. Alexandria Motor Cars, Inc.*,
    289 Fed. App'x 629 (4th Cir. 2008)) .............................................................27

*Lewis v. Md. Sheriff's Youth Ranch*, 2012 U.S. Dist. LEXIS 101773,
    2012 WL 3012634 (D. Md. July 20, 2012) ..................................................41

*M&M Medical Supplies & Serv., Inc. v. Pleasant Valley Hospital, Inc.*,
    981 F.2d 160 (4th Cir. 1992) .......................................................................23

*Mackey v. Shalala*,
    360 F.3d 463 (4th Cir. 2004) .......................................................................36

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991).....................................................................................24

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).....................................................................................24

*McLean v. Runyon*,
    222 F.3d 1150 (9th Cir. 2000) .....................................................................47

*Munday v. Waste Management of N. America, Inc.*,
    126 F.3d 239 (4th Cir. 1997) .......................................................................36

*Nye v. Roberts*.
    145 Fed. Appx. 1 (4th Cir. 2005) ...........................................................32, 34

*Petty v. Freightliner Corp.*,
    113 F. Supp. 2d 808 (W.D.N.C. 2000).......................................................47

*Poole v. City of Plantation*,
    2010 U.S. Dist. LEXIS 109306 (S.D. Fla. Oct. 14, 2010) ...........................39

*Porter v. United States Alumoweld Company, Inc.*,
    125 F.3d 243 (4th Cir. 1997) .......................................................................44

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002).........................................................................25, 27, 35

*Reed v. Buckeye Fire Equip.,*
　　241 F. App'x 917 (4th Cir. 2007)................................................25, 27

*Reeves v. Sanderson Plumbing Products, Inc.*,
　　530 U.S. 133 (2000)...............................................................24

*Rhoads v. F.D.I.C.*,
　　257 F.3d 373 (4th Cir. 2001) .................................................50

*Rodriguez v. Smithfield Packing Co.*,
　　545 F. Supp. 2d 508 (D. Md. 2008)..................................25, 27, 28

*Ross v. Committee Satellite Corp.*,
　　759 F.2d 355 (4th Cir. 1985) .................................................36

*Santorocco v. Chesapeake Holding Co., LLC*,
　　2010 U.S. Dist. LEXIS 58160 (D. Md. 2010) ..........................28, 35

*Stallings v. Hussmann Corp.*,
　　447 F.3d 1041 (8th Cir. 2006))................................................36, 40

*Sullivan v. Cato Corp.*,
　　2006 U.S. Dist. LEXIS 14612, 2006 WL 644469 (D.S.C. 2006) ...............31

*Thompson v. E.I. DuPont deNemours & Co.*,
　　70 Fed. App'x 332 (6th Cir. 2003)................................................47

*Ulrich v. City and County of San Francisco*,
　　308 F.3d 968 (9th Cir. 2002) .................................................38

*U.S. Airways, Inc. v. Barnett*,
　　535 U.S. 391 (2002)...............................................................45

*Vanderpool v. Inco Alloys International, Inc.*,
　　1999 U.S. Dist. LEXIS 12363 (S.D. W. Va. June 3, 1999) ...........29

*Williams v. Channel Master Satellite System*,
　　101 F.3d 346 (4th Cir. 1996) .................................................47

*Wright v. Southwest Airlines*,
    319 Fed. App'x 232 (4th Cir. 2009).................................................36

*Yashenko v. Harrah's NC Casino Co., LLC*,
    446 F.3d 541 (4th Cir. 2006) ......................................................28

## STATUTES AND REGULATIONS

28 U.S.C. § 1291 ...............................................................................1
28 U.S.C. § 1331................................................................................1
29 U.S.C. § 2601 *et seq.*, ("FMLA") .......................................... 1, 19-23
42 U.S.C. § 2000(e) *et seq.*, ("Title VII") ................................... 1, 19-20
42 U.S.C. § 12101 *et seq.*, ("ADA")...............................................1, 23

29 C.F.R. § 825.302 ........................................................................27
29 C.F.R. § 1630.14(c)......................................................................44

## STATE STATUTES

Md. Code Ann. State Gov't Title 20.........................................20, 21, 22

## RULES

Fed. R. Civ. P. 56(c).........................................................................23

## I.  **Jurisdictional Statement**

Subject matter jurisdiction in the district court was proper under 28 U.S.C. § 1331, as this case presents a federal question arising under, *inter alia*, 29 U.S.C. 2601 *et seq.*, ("FMLA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sections 2000(e), *et seq.* ("Title VII"), and the Americans With Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*, ("ADA").  The jurisdiction of the United States Court of Appeals for the Fourth Circuit is vested in and asserted under 28 U.S.C. 1291, as this appeal arises from a final judgment of the district court entered June 3, 2014, disposing of all parties' claims.  Mr. Adams filed timely notice of his instant appeal on June 17, 2014 (J.A. at 593).

## II.  **Issues Presented for Review**

A. Did the district court err in granting judgment as a matter of law with respect to Appellant's claims based on Appellee's interference with his rights under the FMLA?

B. Did the district court err in failing to address whether the challenged employment actions alleged in the Complaint independently qualified as adverse employment actions for purposes of the retaliation claims pled?

C. Did the district court err in granting judgment as a matter of law with respect claims based on Appellee's failure to reasonably accommodate Appellant for his known disability under the ADA?

### III.    Statement of the Case

#### A. Relevant Facts

##### 1.    Mr. Adams Has a Long History of Satisfactory and Exemplary Work Performance.

Mr. Adams began working for AACPS in 1979 as an Industrial Arts Teacher.  J.A. at 251.  He worked as an Industrial Arts/ Technology Education Teacher in a variety of schools in Anne Arundel County.  *Id.*  After briefly leaving AACPS in 1999 to work for Montgomery County as a resource teacher for technology education, Mr. Adams returned to AACPS that same year.  J.A. at 251-52.  In 2000, Mr. Adams became an Assistant Principal and was initially assigned to Brooklyn Park Middle School.  J.A. at 255-56.  In 2003, he was transferred to MacArthur Middle School.  *Id.*   In 2010, Mr. Adams was the 8th grade administrator for MacArthur Middle School ("MacArthur").  J.A. at 364-66, ¶ 1.

Mr. Adams has always performed satisfactory work.  Mr. Adams has received favorable evaluations, salary increases, bonuses, commendations, and awards throughout his 33-year career.  Mr. Adams' Performance Evaluations rated him as "Outstanding" in 2000, 2008, 2009, and 2011 and "Excellent" in 2001, 2002, 2003, 2004, 2005, 2006, and 2007.  J.A. at 381-418.  In the 2006-2007 Teacher Perception Survey for MacArthur Middle School, Mr. Adams was described as someone who resolves problems "quickly & fairly," and, "This man is a great example of what a good impartial principal would be like.  He always takes

2

a thorough look at topics, and when needed gives constructive criticism, and never attacks. MacArthur would be a very different place with him as principal." J.A. at 422, ¶ 2; 423, ¶ 3; 430. Mr. Reginald Farrare, Principal at MacArthur, testified at his deposition that he knew Mr. Adams very well during the period that Mr. Adams reported to him, and that Mr. Adams was a "very astute . . . and very positive member of the team." J.A. at 472-73.

### 2. AACPS' Investigates an Incident Involving Mr. Adams and a Student on January 19, 2010.

On January 19, 2010, Mr. Adams was involved in an incident in which a student verbally threatened him while violently flailing her arms. J.A. at 528. Rebecca Bene, a teacher who saw the incident, described it as follows:

> I observed Mr. Adams facing the girl with both his arms straight down at his sides as he stepped in front of her to block her each time she turned, so that she could not get past him. Their bodies were close but not touching . . . . Mr. Adams was talking to the female student in a controlled voice that I was unable to hear clearly from where I stood, and his face had a calm but alert expression as he continued to talk to the girl.

J.A. at 528. Ms. Bene went on to state that the student "started to flail her arms about her like someone who is trying to keep someone away . . . . Mr. Adams raised his hands and used them to guide her forearms downwards. At that point, Officer Marcus appeared and the girl was escorted into the stairwell and out of my view." *Id.* Ms. Bene described the student's behavior as "less like a child having a

tantrum and more like someone having a violent outburst.  The student definitely was out of control; Mr. Adams definitely was not."  *Id.*

Ms. Davis, in consultation with Mr. Farrare (neither of whom witnessed the incident), called the Anne Arundel County Department of Social Services, which referred the matter for investigation to Anne Arundel County's Child Protective Services ("CPS") for investigations.  J.A. at 479-80; 516-17; 588.  On January 21, 2010, a CPS investigator (Lisa Ertz) interviewed Mr. Adams.  J.A. at 260; 588.  She then left, but later returned after speaking to eyewitnesses.  J.A. at 260.  The investigator told Mr. Adams that he "had nothing to worry about."  *Id.*  The matter was also referred to AACPS' Employee Case Management ("ECM") for investigation because CPS was involved, and the student had alleged Mr. Adams "shook her during the interaction."  J.A. at 145-46; 538; 588.[1]  Mr. Adams was reassigned "pending outcome of the investigations."  J.A. at 538; 588.

On January 22, 2010, Mr. Adams was removed from MacArthur Middle School, "due to allegations of staff misconduct."  *See* J.A. at 578 (AACPS Superintendent of Schools' letter to Mr. Adams dated January 22, 2010).  *See also* J.A. at 264-66; 563-64; 588.  Mr. Adams was temporarily reassigned to the Logistics Warehouse and Office of Program Planning (positions without student

---

[1] The student later explained to the AACPS' investigator (Sarah Czach) on February 5, 2010, that Mr. Adams did not physically shake her.  J.A. at 145-46; 602-03.  Nor was the student injured.  *Id.*

contact) pending the outcome of CPS' and AACPS' investigations of the incident. J.A. at 538; 563-68; 579-80.  In the letter, AACPS instructed Mr. Adams that, "Due to the serious nature of the matter, you are not permitted to return to McArthur [sic] Middle School or engage in contact with students or parents" during the reassignment.  J.A. at 578.

On February 4, 2010, a Multi-Disciplinary meeting was held, consisting of a committee comprised of two representatives from the Anne Arundel County Department of Social Services ("DSS") and three representatives from AACPS, including Mr. P. Thomas Shanahan, the head of investigations at AACPS.  J.A. at 588; 604-05.  *See also* J.A. at 303-04.  Mr. Liverman chaired the meeting.  J.A. at 304.   The committee unanimously voted that there were no grounds for the allegations of child abuse made against Mr. Adams, and all five persons signed a single-page document (hereinafter the "Resolution Document") which contained a short statement that the allegations of improper behavior on January 19, 2010, had been ruled out.  J.A. at 304-05; 364-66, ¶¶ 3-4.  *See also* J.A. at 588 (ECM Log entry dated 2/4/2010, "Mult-D ruled out physical abuse.").[2]  The day after CPS

---

[2] AACPS disputes whether a "Resolution Document" was signed at the Multi-Disciplinary meeting.  J.A. at 602-05.

issued its findings AACPS interviewed the student involved in the incident, as well as four other witnesses.[3]  J.A. at 145-55.

On February 16, 2010, ECM scheduled an interview with Mr. Adams for February 24, 2010, to be conducted by AACPS investigator Sarah Czach and the head of AACPS' investigations, Thomas Shanahan.  J.A. at 588 (ECM entry dated 2/16/2010); 602-03.  On February 22, 2010, ECM met and decided that following Mr. Adams' interview with AACPS' investigators, the matter would be discussed with Mr. Liverman and that Mr. Adams "may be returned to school on Thursday [February 25, 2010]."  J.A. at 588 (ECM entry dated 2/22/2010).  *See also* J.A. at 267.  This indicated that AACPS was also closing their investigation.  J.A. at 267; 304-05; 538; 578.  As Mr. Liverman testified, AACPS typical practice is to issue a resolution letter after being notified of a favorable CPS ruling, when the case does not involve physical injury.  J.A. at 540-41.  *See also* n. 1, *supra*.

On February 24, 2010, Mr. Adams and his then-counsel Richard Kovelant met with Mr. Thomas Shanahan, the head of investigations at AACPS, and the assigned investigator, Ms. Sarah Czach.  J.A. at 267; 364-66, ¶ 3; 588.  Although Mr. Shanahan showed Mr. Adams the Resolution Document, Mr. Shanahan

---

[3] The student involved in the incident, as well as three other witnesses reported that some form of "physical contact" had occurred between Mr. Adams and the student as a result of the altercation.  J.A. at 145-55.  However, AACPS also confirmed that no injury was reported to the school nurse by the student.  *Id.*  The other three witnesses interviewed did not observe any physical contact.  *Id.*

refused Mr. Adams' request for a copy. *Id.* J.A. at 303-04. In any event Mr. Shanahan stated that AACPS was returning Mr. Adams to MacArthur Middle School the very next day, on February 25, 2010.[4]  J.A. at 267-68; 270; 569; 581. As reflected in the letter Mr. Adams initially received informing him of his temporary reassignment pending the investigations, Mr. Adams had, as of February 24, 2010, been cleared of the allegations against him and was, therefore, being returned to duty at MacArthur Middle School. J.A. at 578; 581. *See also* J.A. at 196; 481; 538; 592. Mr. Farrare testified also that, as he understood, Mr. Adams "had been cleared of the allegations and that he was cleared to report back to school," based on information he received from AACPS of Education for AACPS. J.A. at 481-82.

As of February 24, 2010, Mr. Adams was cleared of any wrongdoing by CPS and AACPS, as indicated by AACPS' decision to return Mr. Adams to his duties at MacArthur and the Multi-Disciplinary meeting on February 4, 2010. J.A. at 267-68; 270; 303-05; 364-66; 481-82; 538; 540-41; 563-69; 578-81; 588; 592; 602-05. AACPS made no investigative efforts concerning the January 19, 2010, incident after February 24, 2010, until Mr. Adams' return from approved FMLA leave on March 3, 2010. J.A. at 145-55; 274-77; 343. Accordingly, the only basis

---

[4] AACPS disputes showing Mr. Adams the Resolution Document and that their investigation had concluded, but does not dispute reassigning Mr. Adams back to MacArthur. *See* n. 2, *supra.* J.A. at 581; 602-05.

to continue pursuing the allegations was to discriminate and retaliate against Mr. Adams.

### 3. On February 25, 2010, Mr. Adams Takes His First Medical Leave for a Chronic Medical Condition.

On February 25, 2010, Mr. Adams was diagnosed by Dr. Kim Bondurant with high blood pressure, chronic anxiety, and stress. J.A. at 274-75; 364-66, ¶ 9; 368. Mr. Adams was prescribed Ativan (lorazepam) to relieve his anxiety. *Id.* Mr. Adams notified Mr. Farrare of his need for leave on February 25, 2010, via e-mail, providing a note from Dr. Bondurant and a description of his medical condition. J.A. at 275-76; 343; J.A. at 490-91; 496. AACPS made no additional inquiries to deem whether FMLA leave was appropriate. Mr. Adams took medical leave from February 25, 2010, until March 2, 2010, as a result of his chronic serious medical conditions. J.A. at 274-77; 343.

### 4. On March 3, 2010, Immediately After Mr. Adams Returns from FMLA Leave, Mr. Adams' Supervisor (Mr. Farrare) Verbally Attacks Him and AACPS "Continues" its Investigation Concerning the January 19, 2010, Incident.

On March 3, 2010, the morning that Mr. Adams returned from his medical leave, he attended a meeting with Sara Eger, Annual Yearly Progress Specialist, in her office, when he had difficulty breathing and fell to the floor, gasping for breath and suffering from an acute panic attack. J.A. at 278-80; 502; 506-08; 509; 514-15. Mr. Adams asked Ms. Eger to get the school nurse. J.A. at 279; 506-09. Ms.

Eger left and informed Mr. Farrare that Mr. Adams was hyperventilating on the floor.  J.A. at 483-85; 502; 506-08; 509; 515.

Mr. Farrare then entered the office, closed the door, and observed that Mr. Adams was breathing heavily on the floor.  J.A. at 279-80; 489.  Mr. Farrare began verbally attacking Mr. Adams, stating, "I don't know what your problem is . . . The school is in enough chaos without you.  I do not need your kind of problems in my building."  J.A. at 280; 483-86; *see also* J.A. at 492  (email dated March 3, 2010, from Mr. Farrare to Donna C. Cianfrani, stating Mr. Farrare told Mr. Adams, "We do not have time to play these games.").  Mr. Farrare did not allow Mr. Adams to seek medical treatment with the school nurse and ordered him to leave the building and "get himself together."  J.A. at 280; 483-86; 492; 514.

Mr. Farrare testified that he was informed that Mr. Adams' medical leave was due to anxiety attacks, probably by his secretary Deanna Natarian.  J.A. at 476.  In addition, at some point, Mr. Farrare discussed with his staff, including Jolyn Davis and Sara Eger about how it appeared that Mr. Adams would fake an injury in order to have a day off and that he was "playing games with the doctor's notes."  J.A. at 474; 500-01.  Mr. Farrare testified that he expressed "frustration" to his staff "at having to reassign duties and responsibilities" during Mr. Adams' medical leave.  J.A. at 475.  According to Ms. Eger, he and other staff members "expressed frustration that [they] were down a member of the team."  J.A. at 504-05.

According to Ms. Davis, on one to five occasions, Mr. Farrare expressed frustration about not having a "consistent assistant principal." J.A. at 513. *See also* J.A. at 522 (AACPS' Staff Meeting Minutes stating, "Missing was the consistency and input of an 8th grade administrator.").

On March 3, 2010, AACPS also decided to "continue" their investigation of Mr. Adams based on a "number of factors." J.A. at 145-55; 540-41. On that date, AACPS questioned two witnesses (teachers Rebecca Bene and Jesse Reiger) regarding written statements they had previously submitted on January 21 and 22, 2010 (well before AACPS conducted interviews of the other witnesses, on February 5, and 23, 2010). J.A. at 145-46. Consistent with Ms. Bene's and Ms. Reiger's previously provided statements, neither witness reported observing any physical contact between Mr. Adams and the student, nor any wrongdoing on Mr. Adams' part. *Id.*

### 5.     On March 3, 2010, Mr. Adams Takes His Second Medical Leave.

On March 3, 2010, after being ordered by Mr. Farrare to leave MacArthur and "get his act together," Mr. Adams sought medical treatment with Dr. Bondurant. J.A. at 286. Dr. Bondurant determined that Mr. Adams was unable to work and ordered him on medical leave until March 8, 2010. J.A. at 286-87. Mr. Adams notified Mr. Farrare of the need for leave via a telephone call with his secretary, Ms. Natarian, and subsequently provided a supporting note from his

doctor.  J.A. at 364-66, ¶ 2; J.A. at 487-88; 495.  Dr. Bondurant also instructed Mr.

Adams that a transfer to a different work location would ease his symptoms.  J.A.

at 286.  Dr. Bondurant referred Mr. Adams to a psychiatrist, Lawrence W. Adler,

M.D., and Mr. Adams subsequently began treatment with Dr. Adler.  J.A. at 286;

290-91.

### 6.    On March 8, 2010, Mr. Farrare Verbally Attacks Mr. Adams Again - Immediately After Mr. Adams Returns from His Second Medical Leave.

On March 8, 2010, the morning Mr. Adams returned from medical leave,

Jolyn Davis (Assistant Principal), Rotunda Floyd-Cooper (Assistant Principal), Ms.

Eger, Ms. Natarian, and Mr. Farrare entered Mr. Adams' office.  J.A. at 271; 294;

477.  Mr. Farrare had informed the others that the purpose of going to see Mr.

Adams was to show support and welcome him back.  J.A. at 478.  However, once

the door was shut, Mr. Farrare immediately began verbally attacking Mr. Adams'

work ethic in connection with his use of medical leave.  J.A. at 271; 294; 296.  Mr.

Farrare attacked Mr. Adams' work ethic and for "what [he] had done to try to take

care of [his] health with doctors' notes for every day that [he] missed."  J.A. at

271.  Mr. Farrare stated that Mr. Adams "was hurting the team because he did not

communicate while he was out."  J.A. at 296.  Ms. Eger tried to stop Mr. Farrare's

attacks, reminding him that he had told her the purpose of the meeting was to

welcome Mr. Adams back.  J.A. at 297.  Mr. Farrare's comments show that

AACPS was considering Mr. Adams' disability and medical leave in evaluating his job performance, suggesting that Mr. Adams should have performed work even when he medically was unable to do so. Mr. Farrare, at his deposition, did not deny the above statement but claimed he did not "recall" saying it. J.A. at 479.

### 7. On March 22, 2010, Mr. Adams Takes His Third Medical Leave.

The stress from the discrimination and retaliation worsened Mr. Adams' symptoms, which became more difficult to control and affected his ability to carry out his usual employment duties. On March 22, 2010, Dr. Adler diagnosed Mr. Adams with Acute Stress Disorder and ordered him on medical leave until July 28, 2010. J.A. at 302; 317; 319; 443-44; 455; 459; 463. Mr. Adams notified AACPS of his need for medical leave on the same day (March 22, 2010). J.A. at 309.

### 8. On March 29, 2010, Dr. Adler Recommends Reassignment as an Accommodation for Mr. Adams' Disability.

On or around March 29, 2010, while still on medical leave, Mr. Adams provided AACPS with a note from Dr. Adler, instructing that Mr. Adams' disability required an accommodation. J.A. at 455; 463. Specifically, Dr. Adler stated, "[H]e will require assignment to another school. His current placement is a trigger for panic attacks and other manifestations of his illness." *Id.*

12

9. **On April 12, 2010, AACPS Orders Mr. Adams to Attend a Pre-Discipline Conference During His Medical Leave.**

On April 12, 2010, instead of responding to Mr. Adams' requests for a reasonable accommodation, AACPS ordered Mr. Adams to attend a pre-discipline conference, scheduled for May 10, 2010, while Mr. Adams was on approved FMLA medical leave. J.A. at 313-14; 570; 582. AACPS' letter of April 12, 2010, informed Mr. Adams that it would "constitute a waiver of his rights" if he refused to attend this work meeting during his FMLA leave. J.A. at 314; 570; 582.

On May 5, 2010, Mr. Adams supplemented his accommodation request with additional paperwork from Dr. Adler. J.A. at 316-17; 349-52; 455-56; 464-67. Dr. Adler certified that Mr. Adams could not perform "[a]ll functions which require employee to be at site of psychological trauma . . . Acute stress disorder is evolved into post-traumatic stress disorder. Symptoms are present in all domains of illness: intrusive recollections, nightmares, reliving of trauma, avoidance of places and persons associated with trauma, anxiety attacks, insomnia, irritability and depersonalizations . . . employee <u>must</u> be reassigned to another location." (Emphasis in original). J.A. at 349-52; 455-56; 464-67.

AACPS nevertheless continued to interfere with Mr. Adams' FMLA leave by requiring him to attend the conference during his medical leave. J.A. at 314; 570; 582. The sole focus of the conference was the previously resolved incident from January 19, 2010, although Mr. Adams had previously been cleared of any

13

wrongdoing by two separate investigations and returned to MacArthur. *Id. See also* J.A. at 267-68; 270; 303-05; 364-66; 481-82; 538; 540-41; 563-69; 578-81; 588; 592; 602-05. As a result of being forced to work during his FMLA leave, Mr. Adams' medical condition greatly deteriorated, and Mr. Adams sought additional medical treatment, including appointments with Dr. Adler (on June 9, 2010, and July 21, 2010) and additional counseling appointments with Anne Arundel Counseling. J.A. at 324-27; 358-63; 450-54; 461-62.

> **10.    On May 24, 2010, while Mr. Adams is on FMLA Leave, AACPS Issues Mr. Adams a Written Letter of Reprimand Concerning the Previously Resolved Incident of January 19, 2010.**

On May 24, 2010, Mr. Adams received a written letter formally disciplining him for the January 19, 2010, incident. J.A. at 314-15; 346-48; 572; 584. The discipline put Mr. Adams at future risk of termination because AACPS' Employee Handbook embraces progressive discipline. J.A. at 372-77. In fact, child abuse is such a serious allegation that AACPS' Employee Handbook devotes two entire pages to child abuse/neglect reporting, and AACPS issued Regulation 904.05 to address the issue. *Id.* J.A. at 364-66. Further, the progressive discipline policies state that "more serious disciplinary matters, including alleged child abuse/neglect" would be handled in a more serious way by the central office. J.A. at 372-77. Also, as outlined in the Level 1 Management Process (Conduct), "the type of action taken against the employee will vary and should be based on the nature of

14

the offense and the employee's previous disciplinary history." *Id.* Item number 6 of the Basic Rules of Employee Management contained in the progressive discipline policies also states that "the degree of discipline must be reasonably related to…the past record of the employee and length of service." *Id.* As Mr. Liverman testified, AACPS disciplinary letters such as the one Mr. Adams received are "permanent." J.A. at 573. In this regard, Mr. Liverman additionally testified:

| | |
|---|---|
| Ms. Smithey: | Under the policies and procedures at the school system[,] if Mr. Adams were to be accused again of any inappropriate conduct with a student[,] would this prior written disciplinary letter have any bearing on that further allegation? |
| Mr. Liverman: | It's safe to say yes. |
| Ms. Smithey: | Can you tell me how it would have any bearing on that? |
| Mr. Liverman: | Well, let's say that something else was to occur of a similar nature. And if an investigation were concluded, then some decisions could be made. However, given the fact that he has had a prior, then chances are if it's very similar, the findings, then chances are there would be a recommendation for a suspension. |

J.A. at 558. Therefore, prior disciplinary actions are taken into consideration. This discipline came approximately three months after Mr. Adams was cleared of the allegations and approved for return to work. J.A. at 267-68; 270; 303-05; 364-66;

481-82; 538; 540-41; 563-69; 578-81; 588; 592; 602-05.   Accordingly, the only

basis for the allegations was to discriminate and retaliate against Mr. Adams.

**11.    AACPS Subjects Mr. Adams to Unnecessary Medical Examinations During his FMLA leave.**

The retaliation and discrimination escalated again on June 18, 2010, when

AACPS required Mr. Adams to attend medical examinations during his FMLA

leave.   J.A. at 585-86.   AACPS required Mr. Adams to attend three medical

evaluations with Anthony B. Wolff, Ph.D., of Spectrum Behavioral Health, on

June 30, July 19, and July 21, 2010.   *Id.*   J.A. at 319; 354-57.   AACPS allegedly

scheduled the medical examination "[d]ue to concerns regarding your fitness to

perform your duties."   J.A. at 585.   However, Mr. Liverman admitted during his

testimony that there actually were no concerns about Mr. Adams' fitness for duty.

J.A. at 554.   AACPS had no reasonable belief or evidence that Mr. Adams'

disability would not allow him to perform his essential job functions upon his

return to work after his FMLA leave with reasonable accommodation and, thus, the

required medical evaluations merely interfered with Mr. Adams' FMLA leave, and

are further evidence of retaliation and discrimination on AACPS' part.   On July 19,

2010, Mr. Adams filed a Charge of Discrimination with the EEOC.   J.A. at 378-79.

On July 21, 2010, Mr. Adams' doctor (Dr. Adler) released him from treatment.

J.A. at 317-18; 353; 457; 468.

**12.    AACPS' Doctor Recommends Reassignment as an Accommodation.**

On July 28, 2010, AACPS' doctor (Dr. Wolff) issued the results of his examination, determining as follows:

> Mr. Adams' psychological profile is nonsuggestive of any type of risk or dangerousness . . . There is no evidence in Mr. Adams' profile of any tendency toward violence, aggressiveness, or indeed anger difficulties. The only concern is that of anxiety, and at present continued vulnerability to potential stress . . .He is a person of significant personal pride, who has felt humiliated and diminished by these events, and he has experienced emotional discomfort to the extent that he has needed both psychotherapy and psychotropic medications to manage his symptoms. He also believes that his hypertension is associated with these events since it had not been detected before . . . Mr. Adams presents no danger to students, coworkers, himself, or others. He is fit to return to his duties as a school administrator or any other school-based assignment that may be contemplated . . . **The only caveat is that, due to his anxiety and stress reaction, Mr. Adams would best be assigned to a supportive, lower-stress school environment**.

J.A. at 319; 354-57 (emphasis added).  Thus, AACPS' medical evaluation agreed with Dr. Adler's determination that Mr. Adams needed a reasonable accommodation, by assigning him to a "supportive, lower-stress school environment."  *Id.  See also* J.A. at 349-52; 455-56; 464-67 (Dr. Adler's certification providing Mr. Adams "must be reassigned to another location" upon his return to work).

**13.    AACPS Reassigns Mr. Adams to a Higher-Stress, Lower-Paying School.**

In August 2010, Mr. Adams was transferred to J. Albert Adams Academy ("JAA Academy").  J.A. at 338-39.  JAA Academy is an "alternative" middle

school for children with behavior problems. J.A. at 321; 518-19; 561-62. The majority of its students are there due to disciplinary problems at their last school, including expulsion, extended suspensions, or chronic disciplinary issues. *Id.* JAA Academy has the highest poverty rate of any secondary school in the county and has all the criteria to be considered a school with children at risk. J.A. at 330. It is most definitely not a low-stress environment, and is at least as stressful as MacArthur Middle School. J.A. at 322-23. Since Mr. Adams has been at JAA Academy, one student threatened to hit him and another student threatened that he would get Mr. Adams shot. J.A. at 364-66, ¶ 8. In both cases, the investigators and the principal recommended an extended suspension, but AACPS decided not to grant the principal's request for extended suspension and allowed them to stay at the school to continue their education. *Id.*

Moreover, transfer to this school resulted in lower pay for Mr. Adams. J.A. at 329-30. The transfer rendered Mr. Adams ineligible to receive his usual $2,500 bonus for meeting school targets due to the size and population of J. Albert Adams Academy. J.A. at 330-31. AACPS' decision to transfer Mr. Adams to JAA Academy also resulted in a lower salary. J.A. at 331-34; 571; 583. The decreased salary will result in a smaller pension upon Mr. Adams' retirement. J.A. at 331. Mr. Liverman, who made the decision to transfer Mr. Adams to JAA Academy, made no effort to see if there was an equivalent position available, and did not

consider Mr. Adams' salary or attempt to find a reassignment that would not affect Mr. Adams' pay.  J.A. at 556; 559-60; 576.  Mr. Liverman testified that although other schools may have been available for Mr. Adams' reassignment, he did not investigate other options.  J.A. at 560.

### B. <u>Procedural History</u>

Appellant initially brought suit in the Circuit Court for Anne Arundel County against AACPS alleging violations of both federal and state law based on disability discrimination, sex discrimination, and retaliation for, *inter alia*, exercising his rights under the FMLA and Title VII, as well as for requesting a reasonable accommodation under the ADA.  *See* Original Complaint (Doc. 2).  Appellee was served with the Complaint on September 7, 2011.  *See* Statement Regarding Removal (Doc. 11).

Appellee removed Appellant's original complaint from the Anne Arundel County Circuit Court to the U.S. District Court for the District of Maryland on October 7, 2011, based on the action being "predicated on a federal question."  *See* Doc. 11.  Appellee filed its motion to dismiss on that same date (Doc. 6).  Mr. Adams amended his complaint on November 21, 2011 (Doc. 17), and Appellee moved to dismiss the amended complaint on December 20, 2011 (Doc. 18).  On August 14, 2012, after a hearing, the district court dismissed the first amended

complaint and granted Appellant leave to file a second amended complaint (Docs. 23 and 24). *See also* Appellant's Second Amended Complaint (J.A. at 9).

On September 20, 2012, Appellant filed his Second Amended Complaint ("SAC") asserting claims pled under the following counts:

Count I -    Family Medical Leave Violations – under The Family and Medical Leave Act of 1993, 29 U.S.C. 2601 *et seq.*, ("FMLA");

Count II -   Discrimination and Retaliation in violation of Title 20 of Maryland's State Government Article ("Title 20");

Count III -  Intentional infliction of emotional distress under the tort law of the State of Maryland ("IIED");

Count IV -   Discrimination and Retaliation in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*, ("ADA");

Count V -    Discrimination based on gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, ("Title VII");

Count VI -   Violation of the Maryland Declaration of Rights.

*See* J.A. at 9.

On October 5, 2012, Appellee filed its Motion to Dismiss the SAC for Failure to State a Claim (Doc. 26).  On April 2, 2013, the district court granted Appellee's motion, in part, dismissing Count III (IIED), Count V (Title VII, based on gender discrimination), and Count VI (State constitutional claims) in their

entirety.[5]  J.A. at 124.  Mr. Adams' claims based on interference and retaliation respecting his FMLA rights in Count I (FMLA claims), and claims based on discrimination and retaliation against Mr. Adams due to his disability in Counts II and IV (Title 20 and ADA claims), were partially dismissed.

The court held that Counts I, II, and IV could go forward to the extent the claims in those Counts were based on the following operative facts alleged in the SAC:  AACPS' continuation of its investigation concerning an incident involving Mr. Adams and a student, which occurred on  January 19, 2010 ("the January 19 incident"); the pre-discipline conference conducted by AACPS in May 2010, which AACPS compelled Mr. Adams to attend while on approved FMLA leave; AACPS' formal written disciplinary reprimand of Mr. Adams after the pre-discipline conference; and AACPS' reassignment of Mr. Adams' employment to JAA Academy at a reduced salary.  J.A. at 124.

On September 20, 2013, Appellee filed its Motion for Summary Judgment (J.A. at 127). Mr. Adams filed a timely response on November 11, 2013 (J.A. at 205).  Appellee filed its Reply on December 6, 2013 (Doc. 56).  On June 3, 2014, after a hearing, the district court issued an Order and Memorandum Opinion granting Summary Judgment in favor of Appellee as to all remaining claims (J.A.

---

[5] Mr. Adams is not appealing the district court's ruling with respect to Counts III, V, and VI.

at 561).  Judgment was entered on the same day (J.A. at 592).  Mr. Adams filed timely notice of his instant appeal on June 17, 2014 (J.A. at 593).

## IV.  <u>Summary of Argument</u>

The district court erred in granting judgment as a matter of law with respect to Mr. Adams' claims.  As an initial matter, Appellee made no argument in support of its motion for summary judgment with respect to Mr. Adams' FMLA claims based on interference with his FMLA rights, and instead merely provided that its arguments were identical to those in defense of the retaliation claims.  J.A. at 599.  Similarly, the district court failed to properly consider this claim and, instead, convoluted the elements governing FMLA interference claims with those elements required to establish evidence of retaliation against Mr. Adams based on the exercise of his FMLA rights.  The two claims are distinct, albeit based on the same operative facts, and the district court's failure to assess whether those facts could reasonably be construed as interfering with Mr. Adams' FMLA rights, was plain error.

The district court also failed, generally, to consider the facts in a light most favorable to the non-moving party (Appellant) concerning Mr. Adams' retaliation claims under the FMLA, ADA and Title 20, particularly with respect to the timing of AACPS' investigation of Mr. Adams and its decision to issue a formal written reprimand after that investigation.  As the record in this case shows, each step

AACPS took with regard to its investigation, subsequent discipline, and ultimate reassignment of Mr. Adams provides sufficient evidence for a jury to find AACPS responded to Mr. Adams' use of FMLA leave and known disability by retaliating and discriminating against Mr. Adams.

The district court also did not properly consider whether AACPS failed to accommodate Mr. Adams' known disability when it reassigned him to JAA Academy, disregarding not only the likelihood that the reassignment would trigger his already diagnosed Acute Stress and Post Traumatic Stress Disorder ("PTSD"), but also failing to properly consider whether the diminution in pay Mr. Adams suffered as a result of that reassignment was, itself, a failure to accommodate under the ADA.

## V. <u>Argument</u>

### A. **Standard of Review**

The standard of review of a grant of summary judgment is *de novo*. *M&M Medical Supplies & Serv., Inc. v. Pleasant Valley Hospital, Inc.*, 981 F.2d 160, 163 (4th Cir. 1992) (en banc). Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). In reaching its determination, the court must "draw all

justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991)(*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)("[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.")

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby,* 477 U.S. at 248. In the present case, at a minimum, material disputed facts exist regarding Appellant's claims and, accordingly, summary judgment is inappropriate.

**B.    The District Court's Order Granting Summary Judgment with Respect to the Claims in Count I was in Error.**

**1.    There are Triable Facts Showing AACPS Violated Mr. Adams' Rights under the FMLA.**

Mr. Adams' claims of "interference" and "retaliation" under the FMLA are both predicated on the same factual allegations. J.A. at 95. In order to prove his

FMLA interference claims, Mr. Adams must ultimately prove: 1) he was eligible under the statute; 2) the statute covered AACPS, Mr. Adams' employer; 3) the FMLA entitled Mr. Adams to leave; 4) Mr. Adams gave AACPS sufficient notice of his intent to use leave; and 5) AACPS denied, or interfered with, benefits to which Mr. Adams was entitled, causing harm to Mr. Adams. *Bosse v. Balt. Cnt'y.*, 692 F. Supp. 2d 574, 584-88 (D. Md. 2010) (citing *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516, 523 (D. Md. 2008)). *See also Reed v. Buckeye Fire Equip.,* 241 F. App'x 917, 924 (4th Cir. 2007); *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89 (2002). *See also* J.A. at 98.

Appellee arguments with respect to the FMLA interference claims in the proceedings below were limited to those presented in its motion to dismiss (Doc. 26). There, Appellee argued, alternatively, that Mr. Adams did not provide sufficient notice of his need to take leave, and/or that AACPS did not deny Mr. Adams FMLA leave. J.A. at 99-100. Appellee made no argument in support of its motion for summary judgment regarding Mr. Adams' claims of interference under the FMLA, simply stating its arguments were identical to those in defense of the FMLA retaliation claims. J.A. at 599.

Similarly, the district court erred when it concluded that the determination of an "adverse employment action" for purposes of Mr. Adams' interference claims under the FMLA in Count I were "identical" to the determination of an adverse

25

employment action as applied to the FMLA retaliation claims in Count I.   J.A. at 104; *id.* at n. 25 (holding that "Adams may pursue such FMLA claims under theories of retaliation and interference…Based upon the conduct the Court determined sufficient to state a plausible claim of 'adverse action' for purposes of retaliation claims.").  The district court not only misconstrued the relevant inquiry concerning Appellant's FMLA *retaliation* claims (discussed below), but also failed to make any separate findings with respect to Mr. Adams' claims that AACPS *interfered* with Mr. Adams' FMLA rights.   J.A. at 75-94; 626-28.   Instead, the district court determined that the facts and circumstances regarding AACPS' adverse actions against Mr. Adams could not be construed as interference with Mr. Adams' FMLA rights because those actions were allegedly predicated on an investigation that began before Mr. Adams' need for FMLA leave arose.   *Id.*  J.A. at 635, n. 7; 646, n. 14; 647.[6]   However, for the purposes of Mr. Adams' claims of

---

[6]  As stated by the Court in its Memorandum and Order of Summary Judgment:

> Thus, because Adams cannot prove that the investigation was reopened, neither the pre-discipline conference nor the written reprimand qualifies as an adverse employment action because those challenged actions resulted directly from an ongoing investigation into Adams' compliance - or lack thereof –with MacArthur procedures.

J.A. at 647.  *Cf.,* J.A. at 646, n. 14 (declining to consider whether the challenged actions independently qualified as adverse employment actions).

interference under the FMLA, Appellee's motivation for conducting its investigation is irrelevant. *Bosse; Rodriguez; Reed; Ragsdale, supra.*

As for Appellee's arguments regarding notice under the FMLA, notice to an employer requires an employee only to "'inform her employer that she needs leave from work for a medical reason.'" *Bosse,* 692 F. Supp. 2d at 584-585 (quoting *Krenzke v. Alexandria Motor Cars, Inc.*, 289 Fed. App'x 629, 632 (4th Cir. 2008)). *See also* 29 CFR § 825.302:

> An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job . . . When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA.

*Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d at 516-517. The district court correctly found an employee does not need to specifically state that the employer is requesting FMLA leave.[7] J.A. at 100; *Bosse*, 692 F. Supp. 2d at 584-585.

---

[7] On February 25, 2010, Mr. Adams took his first medical leave relevant to this case. J.A. at 9-29, ¶ 10a. *See also* Statement of Facts, Section III A.3, *supra.* He provided a doctor's note and emailed Mr. Farrare to inform him of his need for leave. *Id.* This notification was adequate to alert AACPS that Mr. Adams was taking leave covered by the FMLA. *Bosse*; *Rodriguez, supra.* On March 3, 2010, when Mr. Adams took his second medical leave relevant to this case, he notified Mr. Farrare by telephone of his need for medical leave and submitted a supporting note from his doctor shortly after. J.A. at 9-29, ¶ 11a. *See also* Statement of Facts, Section III A.4, *supra.* Again, this provided AACPS with adequate notice that Mr.

a.   **There are Sufficient Facts in Evidence to Show that Appellee Interfered with Mr. Adams' Rights under the FMLA, as Alleged in Count I.**

AACPS also argued in its motion to dismiss that because Mr. Adams' was granted requested leave, AACPS did not interfere with his rights under the FMLA. J.A. at 101.  Interference, however, is not limited to a denial of requested leave. *Bosse*, 692 F. Supp. 2d at 585. When an employer discourages an employee from using FMLA leave, engages  in "'manipulation … to avoid responsibilities under FMLA" or "use[s] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or *disciplinary actions*,'" an employer interferes with an employee's rights under the FMLA.  *Glunt v. GES Exposition Services, Inc.*, 123 F. Supp. 2d 847, 870 (D. Md. 2000) (emphasis added).  *See also Bosse*, 692 F. Supp at 585 (quoting *Glunt*, 123 F. Supp. 2d at 870); *Santorocco v. Chesapeake Holding Co.*, LLC, 2010 U.S. Dist. LEXIS 58160, at *12-13 (D. Md. 2010).  Additionally, where an employer requires documentation that exceeds the documentation required for non-FMLA leave, a genuine dispute of material fact

---

Adams was taking medical leave and engaging in protected activity under the FMLA.  *Rodriguez, supra.  See also Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 551 (4th Cir. 2006).  On March 22, 2010, when Mr. Adams took his third medical leave, he provided AACPS with a note from Dr. Adler, which stated the need for medical leave until July 28, 2010.  *See* J.A. at 302; 309; 317; 319; 443-44; 455; 459; 463; Statement of Facts, Section III A.7-8, *supra.*  Mr. Adams' notification to AACPS and his supporting documentation clearly provided notice to Appellee.

exists regarding whether the employer has interfered with or denied an employee use of FMLA leave. *Bosse,* 692 F. Supp. 2d at 586-88. In other words, "where an adverse employment action is influenced by the taking of family leave, the employer interferes with that employee's exercise of their rights under the FMLA." *Glunt,* 123 F. Supp. 2d. at 870-871.

For purposes of Mr. Adams' interference claims under the FMLA, AACPS interfered with Mr. Adams' rights under the FMLA when it took a series of adverse actions against Mr. Adams in the course of his employment. However, "[t]he intent of the employer is irrelevant" and, thus, the question of whether those actions were part of an investigation is irrelevant. *See Klaiber v. Rinaldi*, 2001 U.S. Dist. LEXIS 23964, 2001 WL 1860963 (M.D.N.C. Feb. 12, 2001)(citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)). *See also Vanderpool v. Inco Alloys Int'l, Inc.,* 1999 U.S. Dist. LEXIS 12363 at *17 (S.D. W. Va. June 3, 1999)(finding that although appropriate for FMLA claims of retaliation, for claims of violation of substantive rights under the FMLA, the *McDonnell Douglas* analysis is inappropriate and unhelpful) citing *King, supra*.

AACPS unlawfully interfered with Mr. Adams' medical leave in violation of the FMLA when Mr. Farrare verbally attacked Mr. Adams and refused to allow him to see the school nurse on the same day he returned from FMLA leave (March

3, 2010).[8]  *See* J.A. at 279-80; 280; 489; 483-86; 492; Statement of Facts, Section III A.4, *supra.*  As Mr. Adams lay on the floor of his co-worker's office gasping for breath and suffering from an anxiety/panic attack, Mr. Farrare berated him, denied him access to the school nurse, and ordered him to go home and "get himself together."  *Id.*  The district court found with respect to this incident, however, that "there is no plausible allegation that Principal Farrare completely denied Adams the ability to seek medical attention on March 3, [2010]."  J.A. at 80, n. 13; 81.  The district court's holding was in error because it considered only whether Mr. Farrare 'completely denied' Mr. Adams medical leave, and did not consider whether he interfered with that leave.  *Id.*  *See Bosse, supra* at 585 (providing that interference claims under the FMLA are not limited to a denial of requested leave).

On March 8, 2010, when Mr. Farrare verbally attacked Mr. Adams in front of a group of his peers and reprimanded him for "hurting the team" and not "communicating" while he was on leave, AACPS again interfered with Mr. Adams' rights under the FMLA.  *See* J.A. at 271; 294; 296; 297; Statement of Facts, Section III A.6, *supra.*  With respect to this incident, the district court held that "At most, Principal Farrare's statement can be categorized as a verbal criticism

---

[8] AACPS then retaliated against Mr. Adams for taking medical leave when it decided to "continue" its investigation of Mr. Adams the same day he returned from medical leave.  *See* J.A. at 646, n. 14; Statement of Facts, Section III A.4, *supra*.

and reprimand of Adams' conduct while on medical leave." J.A. at 82. However, the behavior, *as described by the district court* is highly probative of whether an employer has interfered with its employee's FMLA leave. *See Chauncey v. Life Cycle Eng'g. Inc.*, 2013 U.S. Dist. LEXIS 140579, 2013 WL 5468237 (D.S.C. Sept. 30, 2013) ("calling [the employee] can be probative of [interference] when the [employee] is asked to continue working.) (citing *Sullivan v. Cato Corp.*, 2006 U.S. Dist. LEXIS 14612, 2006 WL 644469 (D.S.C. 2006)). Both this verbal reprimand and Mr. Farrare's previous verbal assault on Mr. Adams constitute adverse employment actions that interfered with Mr. Adams' FMLA leave. These actions resulted in Mr. Adams facing an increasingly stressful work environment, leading to further harm to Mr. Adams. *See* Statement of Facts, Section III A.3-8, *supra*.

When Mr. Adams went on medical leave again, on or around March 22, 2010, AACPS was aware that Mr. Adams was engaging in protected activity under the FMLA, as Mr. Adams again provided a note from his doctor. J.A. at 309; 463; Statement of Facts, Section III A.7, *supra*. Moreover, *during* Mr. Adams' medical leave AACPS ordered Mr. Adams to attend a work-related pre-discipline conference, further interfering with Mr. Adams' rights under the FMLA. J.A. at 313-14; 570; 582; Statement of Facts, Section III A.9, *supra*. AACPS had full knowledge that Mr. Adams was on medical leave for acute anxiety and stress, but

notified Mr. Adams that it would "constitute a waiver of his rights" if he refused to attend the meeting during his FMLA leave.  *See* J.A. at 314; 570; 582; Statement of Facts, Section III A.8-9, *supra.*  Generally, requiring an employee to perform work during FMLA leave constitutes interference with that employee's FMLA rights.  *See Chauncey, supra,* citing *Arban v. W. Pub. Corp.*, 345 F.3d 390 (6th Cir. 2003).  Not only was the conference a clear interference with Mr. Adams' rights to leave under the FMLA, but attending worsened his condition, causing him to seek additional medical treatment.  *See* Statement of Facts, Section III A.9, *supra.*

On May 24, 2010, while still on FMLA leave, Mr. Adams received a written disciplinary letter following the pre-discipline conference, subjecting Mr. Adams to yet another adverse employment action in violation of the FMLA.  *See* J.A. at 584; Statement of Facts, Section III A.10, *supra.*  As described above, reprimands which could lead to further disciplinary actions and "work a real, rather than speculative employment injury" may become an adverse employment action. *Jeffers v. Thompson*, 264 F. Supp. 2d. 314 (D. Md. 2003) (citations omitted).  *See also Bosse,* at 586.  A reprimand can constitute an adverse employment action when the reprimand puts an employee on track for progressive discipline. *Daughety v. Harvey*, 2006 U.S. Dist. LEXIS 98805 (D. Md. June 14, 2006).  *See also Nye v. Roberts*. 145 Fed. Appx. 1, 6 (4th Cir. 2005) (finding an employer's use of a progressive form of discipline coupled with a letter of reprimand and a

downgraded performance evaluation "thrust the [plaintiff] further along the discipline track and closer to termination"). *Cf.,* Statement of Facts, Section III A.10, *supra.*

The written reprimand Mr. Adams received as a result of AACPS' "continued" investigation was a reprimand that pushed him down a progressive discipline track. J.A. at 573; 558. The AACPS' Employee Handbook sets forth a progressive discipline policy, which is especially severe in cases of child abuse. J.A. at 372-77; Statement of Facts, Section III A.10, *supra.* As outlined in the Level 1 Management Process (Conduct), future disciplinary actions take into account "an employee's previous disciplinary history." *Id.* J.A. at 372-77. Under AACPS' policies, evidence of the retaliatory investigation and reprimand will be taken into consideration in any future disciplinary matter, as well as have a significant detrimental effect on Mr. Adams' opportunities for promotion and professional development. *Id.* Even further, the reprimand itself warns that Mr. Adams could face additional action. J.A. at 584. The reprimand states, "You are also reminded that continued conduct of this nature may result in further administrative action against you up to and including termination." *Id.* The letter references "an investigation regarding allegation that you grabbed a student by the arms, shook her, and pinned her against the wall." *Id. Cf.,* J.A. at 145-46; n. 1, *supra.* As such, the letter *clearly* infers alleged child abuse. J.A. at 584. This

letter not only puts Mr. Adams at risk for more serious disciplinary action, but also contains statements regarding physical abuse towards a child that are devastating to a professional school administrator. *Id.* The reprimand, a result of the unwarranted investigation, is now contained in Mr. Adams' personnel record and significantly affects Mr. Adams' opportunities for promotion and professional development. *See Jeffers; Bosse; Daughety; Nye, supra.*

AACPS' interference with Mr. Adams' FMLA rights continued when it required him to undergo three medical examinations while on FMLA leave, allegedly to asses Mr. Adams' fitness for duty. *See* J.A. at 554; 574-75; 585-86; Statement of Facts, Section III A.11, *supra.* While Appellee may have had reason, at some point after Mr. Adams' return from FMLA leave, to request a fitness for duty examination in connection with Mr. Adams' request for a reasonable accommodation of his disability, the three examinations ordered by AACPS during Mr. Adams' FMLA leave were unnecessary and in violation of Mr. Adams' FMLA rights, *id.*, particularly since the examinations by AACPS' doctor only confirmed what Mr. Adams' doctor had already told them. *Id. See also* J.A. at 354-57; 464-67; Statement of Facts, Section III A.12. Mr. Adams had already provided AACPS with substantial medical documentation stating the extent of his medical disability and his need for a reasonable accommodation. *See* Statement of Facts, Section III A.7; A.11, *supra.* Furthermore, AACPS did not have any reasonable belief or

evidence to suggest that Mr. Adams would not be able to work with an accommodation upon his return after leave. *Id.* As Mr. Liverman testified, "As far as [Mr. Adams'] job performance, I don't recall there being any concerns of his ability to do the work." J.A. at 554. The unnecessary examinations were simply another instance of AACPS interfering with Mr. Adams' FMLA rights. *See Bosse,* 692 F. Supp. 2d at 586-88 (where defendants require additional documentation that exceed the documentation required for non-FMLA leave, a genuine dispute of material fact exists regarding whether defendants interfered with or denied plaintiff's use of FMLA leave).

The reduction in Mr. Adams' salary and loss of bonuses due to AACPS' decision to transfer him to JAA Academy also constituted interference under the FMLA. *See* J.A. at 338-39; 322-23; 571; 583; Statement of Facts, Section III A.13, *supra.* Besides termination, no action could more clearly harm or prejudice an employee than a reduction in salary and a loss of compensation. *Bosse,* 692 F. Supp. 2d at 585 (stating that under the FMLA, "[p]rejudice exists if 'compensation and benefits [are] lost by reason of the violation.'") (citations omitted). The FMLA prohibits actions by employers which discourage or interfere with taking FMLA leave, and a reduction in salary fits well within the ambit of an interference claim. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. at 89; *Santorocco, supra.*

**b.    There are Triable Facts in Evidence to Show that Appellee Retaliated Against Mr. Adams for Asserting His Rights under the FMLA, as Alleged in Count I.**

A retaliation claim under the FMLA is distinct from an interference claim under the FMLA in that "the retaliation claim requires proof of retaliatory intent." *Bosse,* 692 F. Supp. 2d at 588 (quoting *Stallings v. Hussmann Corp.,* 447 F.3d 1041, 1051 (8th Cir. 2006)).  To prove a case of retaliation under the FMLA, Mr. Adams must show that: (1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the adverse employment action.  *Wright v. Southwest Airlines*, 319 Fed. App'x 232, 233 (4th Cir. 2009) (quoting *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)).  *See also Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 242 (4th Cir. 1997); *Ross v. Comm. Satellite Corp*., 759 F.2d 355, 365 (4th Cir. 1985); *Glunt*, 123 F. Supp. 2d at 871; *Bosse, supra.*

Courts use the same analysis of adverse employment actions under Title VII for claims of retaliation under the FMLA.  *Ainsworth v. Loudon County School Board*, 851 F. Supp. 2d 963, 972 (D.E.Va. 2012).  The standard for a finding of an adverse employment action under the retaliation provisions of Title VII (and thus the FMLA) requires a plaintiff to "show that a reasonable employee would have found the challenged action materially adverse."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006)(citations omitted).  The scope

for retaliatory injury is thus broader under Title VII, and "a Title VII retaliation plaintiff need not allege or prove an ultimate adverse employment action . . . ." *Darveau v. Detecon*, 515 F. 3d 334, 342 (4th Cir. 2008). Rather, actions "that are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination'" constitute adverse employment actions for the purposes of retaliation. *Davidson-Nadwodny*, 2010 U.S. Dist. LEXIS 29165, at *21-22 (D. Md. Mar. 26, 2010) (quoting *Burlington Northern*, 548 U.S. 53, 57, 67).

As applied to this case, the actions taken by AACPS also constituted impermissible retaliatory adverse employment actions under the FMLA. As described above, the timing of AACPS' actions in response to learning of Mr. Adams' use of FMLA leave, as well as Mr. Adams' disability, are sufficiently close in time to establish a causal connection. "To qualify as a causal connection . . . the temporal proximity between the employer's knowledge of the protected activity and the adverse action must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508 (2001). A close temporal proximity with the protected activity and the alleged retaliatory action may be sufficient to establish a causal connection. *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000).

The timing of AACPS' "continuance" of its investigation regarding Mr. Adams' conduct is a material fact in dispute.  J.A. at 637-38.  *See also* Statement of Facts, Section III A.2; A.4; n. 2; n. 4, *supra*.  Moreover, the district court erred in refusing to consider whether each action alleged independently amounted to an adverse employment action for purposes of establishing Mr. Adams' retaliation claims.  *See* Statement of Facts, Section III A.2-A13, *supra. Cf.,* J.A. at 646, n. 14; *Bosse,* 692 F. Supp. 2d at 588 ("[t]emporal proximity between the employer's adverse employment action and the employee's exercise of her rights under the FMLA may reasonably support an inference that the action was taken in violation of the FMLA.") (quoting *Glunt*, 123 F. Supp. 2d at 871).  The record reflects sufficient material facts to allow a jury to conclude that each action taken by AACPS occurred sufficiently close in time after Mr. Adams exercised his rights under the FMLA and, thus, conclude those acts were taken out of discriminatory animus or with a retaliatory motive.  *Bosse, supra*.  As discussed above, Mr. Adams had previously been cleared of all charges, yet once he engaged in FMLA activity, AACPS decided to reopen the matter.[9]  *See* J.A. at 267-68; 270; 303-05;

---

[9] The institution of a retaliatory disciplinary investigation can constitute an adverse employment action. *See Coszalter v. City of Salem*, 320 F. 3d 968, 976-977 (9th Cir. 2003) (holding that, among other actions, "an unwarranted disciplinary investigation" was an adverse employment action for purposes of the plaintiff's lawsuit); *Ulrich v. City and County of San Francisco* 308 F. 3d 968, 977 (9th Cir. 2002) (holding the defendant subjected the plaintiff to an adverse employment action when the defendant conducted an investigation against the plaintiff that

364-66; 481-82; 538; 540-41; 563-69; 578-81; 588; 592; 602-05; Statement of Facts, Section III A.2; A.4, *supra.*

Although disputed, AACPS' investigation was unquestionably winding down, if not over, by at least February 24, 2010, and AACPS had decided to return Mr. Adams to his post the next day. *See* Statement of Facts, Section III A.2, *supra.* Mr. Adams took FMLA leave for his serious medical condition on the day he returned to work, February 25, 2010, after being told the investigation was over. *Id. See also* J.A. at 274-77; 343; Statement of Facts, Section III A.3, *supra.* Thus, evidence exists that AACPS retaliated by, among other things, breathing life back into its investigation.[10] Statement of Facts, Section III A.4, *supra. See also* J.A. at

---

might lead to the revocation of plaintiff's clinical privileges). *See also Poole v. City of Plantation*, 2010 U.S. Dist. LEXIS 109306 (S.D. Fla. Oct. 14, 2010) (finding evidence of frivolous criminal investigation coupled with other evidence of physical threats and demeaning gestures constituted an adverse employment action); *Kallenberg v. Knox County Bd. of Educ.*, 2008 U.S. Dist. LEXIS 89645, at *14-15 (E.D. Tenn. Aug. 12, 2008) (where the defendant conducted an alleged sexual misconduct investigation against a Title VII plaintiff's husband, also an employee of defendant, the investigation "could also be considered an adverse employment action").

[10] According to AACPS' investigative report, the only activities undertaken by AACPS in furtherance of its investigation *after* February 25, 2010, consisted of the following: interviewing two teachers on the same day Mr. Adams returned from his first FMLA leave and was verbally assaulted by Mr. Farrare, on March 3, 2010 (Ms. Rebecca Bene and Mr. Jesse Reiger, who had already provided written statements 2-3 days after the January 19, 2010, incident stating Mr. Adams had acted appropriately); interviewing the teacher of the student involved in the incident on March 5, 2010 (Ms. Illana Moulis, who observed no physical contact between Mr. Adams and the student); and reviewing Mr. Adams' personnel file on

267-68; 270; 303-05; 364-66; 481-82; 538; 540-41; 563-69; 578-81; 588; 592; 602-05.

The district court adopted Appellee's argument that its ECM log (J.A. at 588) is evidence to the contrary, but neither the ECM log nor the other evidence offered by AACPS in this case establishes Appellee's motives as a matter of law. J.A. at 640-42. *Cf., Bosse; Stallings, supra.* Moreover, notwithstanding when AACPS' investigation regarding the January 19, 2010, incident began, the evidence in this case shows AACPS took detrimental action against Mr. Adams very close in time after each medical leave requested by Mr. Adams. *See* n. 10, *supra*; Facts Section III A.2-A.13; *Clark County Sch. Dist. v. Breeden*, *supra*. The ECM log reflects that on February 24, 2010, AACPS interviewed Mr. Adams concerning the investigation and was "completing written report." J.A. at 588. On February 25, 2010, Mr. Adams took FMLA leave. J.A. at 274-75; 368. On March 1, 2010, ECM discussed Mr. Adams' use of FMLA leave. J.A. at 588. On March

---

March 5, 2010. J.A. at 145-55. As is clear from the investigative report, no new information was gleaned from these efforts, and Ms. Bene's and Mr. Reiger's interview revealed only information consistent with their previously submitted written statements, which suggested no fault on Mr. Adams' part. *Id.* The report was signed over one month later, on April 8, 2010. *Id.* After February 25, 2010, and in direct connection with his FMLA leave, Mr. Adams was verbally assaulted twice by Mr. Farrare, required by AACPS to attend a pre-discipline conference regarding the above-referenced investigation, issued a written reprimand concerning that investigation, forced by AACPS to undergo three medical examinations, and ultimately reassigned to another school for less pay and more stress. *See* Statement of Facts, Section III A.1-A.13, *supra.*

3, 2010, AACPS interviewed two teachers despite the fact those teachers had already submitted written statements in January regarding the incident. *See* n. 10, *supra*; J.A. at 145-55. On March 8, 2010, ECM discussed Mr. Adams' return to work. J.A. at 588. Accordingly, AACPS' actions, if proved, could reasonably constitute adverse employment actions causally linked to Mr. Adams' FMLA activity, and the district court's decision granting summary judgment as to Count I was in error.

**C.    The District Court's Order Granting Summary Judgment with Respect to the Claims in Counts II and IV was in Error.**

**1.    There are Triable Facts Capable of Proving AACPS Discriminated Against Mr. Adams based on his Disability, as Alleged in Counts II and IV of the Second Amended Complaint.**

Under the ADA, an employer must not discriminate against an employee with a qualifying disability "with respect to the 'terms, conditions, and privileges of employment.'" *Lewis v. Md. Sheriff's Youth Ranch*, 2012 U.S. Dist. LEXIS 101773, 2012 WL 3012634, at *21 (D. Md. July 20, 2012). To ultimately prevail at trial, Mr. Adams must prove the following elements: (1) he was in the protected class; (2) he was subject to an adverse employment action; (3) he was performing his job at a level that met his employer's legitimate expectations; and (4) the adverse employment action occurred because of his disability. *See Edmonson v. Potter*, 118 F. App'x 726, 727 (4th Cir. 2004). However, to defeat AACPS'

motion for summary judgment, Mr. Adams only needed to show that a genuine dispute of material fact exists with regard to at least one element, with all inferences being drawn in Mr. Adams' favor. *See Bayer v. United States Dep't of the Treasury*, 956 F.2d 330, 333 (D.C. Cir. 1992)(citing *Liberty Lobby*, 477 U.S. at 249).

As the district noted, Mr. Adams qualifies as disabled under the ADA, as evidenced by the diagnoses made by his physicians of high blood pressure, chronic anxiety, and stress in February 2010 (Statement of Facts, Section III A.3, *supra*); his diagnosis of chronic Acute Stress Disorder in March 2010 (Statement of Facts, Section III A.7, *supra*); and his diagnosis of chronic Post-Traumatic Stress Disorder in April (J.A. at 447-50; 458).[11]   J.A. at 115, n. 30.   AACPS does not dispute that Mr. Adams is a qualified individual under the ADA. *Id.*  Nor has there been any argument by Appellee that Mr. Adams failed to perform his job at an acceptable level.   *See* Statement of Facts, Section III A.1, *supra. See also* J.A. at 574-75.  The court also found that the job reassignment qualified as an adverse

---

[11] These impairments substantially limit Mr. Adams' ability to think, work, sleep, and concentrate.  He suffers from insomnia, nightmares, and depression.  J.A. at 288-89; 344; 443; 445-46; 448-51; 453; 459-62.  He has dissociative flashbacks because of events in 2010 (discussed *infra*) and panic attacks when he drives within a few blocks of MacArthur Middle School.  *Id.*  In fact, he cannot even go to the west end of Anne Arundel County; on one occasion, on the way to a store, Mr. Adams took a wrong turn and ended up three to four blocks from MacArthur Middle School.  J.A. at 302-03.  He started shaking and turned white.  *Id.*  His wife, also in the car, had to talk him down and tell him that he was okay.  *Id.*

employment action, but accepted AACPS' proffered reason and found the reassignment was not a pretext for discrimination or retaliation. J.A. at 652-54.

As to the other actions alleged (Statement of Facts, Section IIIs A.2-A.13, *supra*), the district court held that a reasonable jury could not find in favor of Mr. Adams with respect to his discrimination claims in Counts II and IV because those actions were not "adverse." The court's rationale in this regard was the same it applied to Count I, discussed *supra.* J.A. at 635; 645. Although the question is a material fact in dispute, the district court reasoned that since the AACPS' investigation had not *concluded* prior to the adverse actions alleged, those actions taken in supposed furtherance of that investigation, or allegedly as a result of it, could not reasonably be construed as motivated by retaliation or discrimination. *Id. See also* J.A. at 646-67, n. 14. For the reasons discussed above, the district court erred in granting judgment in favor of Appellee with respect to Counts II and IV because the acts complained of qualify as adverse employment actions, and issues of fact concerning the acts alleged remain to be decided by a jury at trial.[12]

---

[12] As discussed above, Mr. Adams has shown that AACPS discriminated against him because of his disability. AACPS became aware of Mr. Adams' disability by at least February 25, 2010, when he provided Mr. Farrare with an email stating the need for leave and submitting a doctor's note detailing his medical condition. *See* Statement of Facts, Section III A.3. Following that notification, Mr. Adams endured verbal abuse from Mr. Farrare on two different occasions. *See* Statement of Facts, Section III A.4; A.6. On the second occasion, Mr. Farrare told Mr. Adams he "was hurting the team because he did not communicate while he was out," thus considering Mr. Adams' disability and leave in evaluating his job

The medical examinations ordered by AACPS also constitute discrimination and harassment under the ADA. *See* J.A. at 585-86; 319; 354-57; Statement of Facts, Section III A.11-12, *supra.* Although fitness for duty examinations are allowed in some cases, they are only proper "where there is a need to determine whether an employee is still able to perform the essential functions of his or her job." *See* 29 C.F.R. pt. 1630, App'x § 1630.14(c). *See also Porter v. United States Alumoweld Company, Inc.*, 125 F.3d 243, 246 (4th Cir. 1997); *Campbell v. Prince George's County,* 2001 U.S. Dist. LEXIS 211, at *17-18 (D. Md. Jan. 4, 2001)(finding because the fitness for duty examination at issue was "not the act of an employer who is concerned that their employee might not be able to perform their job fully or even is concerned that the Plaintiff's work environment may compromise Plaintiff's health," the examination was evidence of discrimination under the ADA).

Here, Mr. Adams had already submitted documentation stating the extent of his disability and the need for an accommodation to be transferred to another school. *See* J.A. at 349-52; 455; 463-67; Statement of Facts, Section III A.8-9. The fitness for duty examination was not necessary to determine whether Mr. Adams could continue to work, as Mr. Adams' own doctor had already stated that Mr.

performance. *See* Statement of Facts, Section III A.6. Furthermore, as described above, once AACPS became aware of Mr. Adams' disability, it used the excuse of the "continued" investigation and subsequent reprimand to discriminate against Mr. Adams on the basis of that disability.

Adams could work with a reasonable accommodation, and Mr. Farrare had no concerns with his performance. *Id.   See also* J.A. at 554.  Furthermore, AACPS subjected Mr. Adams to *three examinations with a psychiatrist*.  *See* J.A. at 585-86; 319-354-57; Statement of Facts, Section III A.11.  Given the facts of this case, the number of examinations required by AACPS exceeded any reasonable  need for an evaluation of Mr. Adams' fitness for duty.  *See Coursey v. Univ. of Md. E. Shore*, 2014 U.S. App. LEXIS 12407 (4th Cir. Md. July 1, 2014)("Whether a required mental health evaluation is "job-related and consistent with business necessity" is assessed under an objective standard.).  *See also* J.A. at 554 (Mr. Liverman testifying that there were no concerns about Mr. Adams' fitness for duty).

> **2.    The District Court Erred by Not Properly Considering AACPS' Failure to Accommodate Mr. Adams' Known Disability.**

Under the ADA, an employer must provide an employee who has a disability with a reasonable accommodation upon the employee's request. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002); *EEOC v. Fed. Express Corp.*, 513 F. 3d 360, 371 (4th Cir. 2008).  The *prima facie* elements of a claim of failure to provide a reasonable accommodation under the ADA are: 1) the plaintiff is covered by the statute as an individual with a disability; 2) the Defendants had knowledge of plaintiff's disability; 3) the plaintiff could perform the "essential

functions of the position sought" with a reasonable accommodation; and 4) the defendant refused to provide the accommodations. *Fink v. Richmond*, 2009 U.S. Dist. LEXIS 89853, at *14 (D. Md. Sept. 29, 2009).

Here, despite the fact that AACPS made no effort to reassign Mr. Adams to a less stressful school where he would not suffer a reduction in pay, the district court incorrectly dismissed all claims based on that reassignment, stating (in a footnote), "While the failure to consider alternative assignments with equivalent pay might contribute to the reassignment being an adverse employment action, it certainly does not indicate that AACPS' proffered reason for the reassignment was pretextual." J.A. at 590, n. 17. *See also* Statement of Facts, Section III A.13, *supra.* The district court erred, not only in its consideration of retaliation and pretext with respect to Mr. Adams' reassignment, but also by not properly considering whether the reassignment failed to reasonably accommodate Mr. Adams' known disability. The district court held that because AACPS transferred Mr. Adams to JAA Academy four months after Mr. Adams' requested accommodation, the accommodation was timely and, thus, no failure took place.[13] J.A. at 123-24.

---

[13] AACPS submitted a letter dated June 2, 2010, as an exhibit to its motion to dismiss and motion for summary judgment. J.A. at 184. The letter notifies Mr. Adams of AACPS' review of the Superintendent's recommendation that he be transferred to JAA Academy. *Id.* The letter, however, does not provide a start date for Mr. Adams' transfer. *Id.* The letter also states, "[t]he Board of Education . . .

Dr. Adler (Mr. Adams' physician) and Dr. Wolff (the physician hired by AACPS for Mr. Adams' medical examinations) recommended that Mr. Adams be reassigned away from his current work location and to a lower-stress environment. *See* J.A. at 455-56; 463; 349-52; Statement of Facts, Section III A.8; A.12, *supra.* AACPS transferred Mr. Adams to JAA Academy, resulting in a decrease in salary and bonus ineligibility. *See* J.A. at 330-34; 338-39; Statement of Facts, Section III A.13, *supra.* Under the ADA, if reassignment is appropriate, then an employer should reassign the individual to an equivalent position if, *inter alia*, there is an equivalent position that is vacant or will be vacant within a reasonable period of time. *See, e.g.*, *Thompson v. E.I. DuPont deNemours & Co.*, 70 Fed. App'x 332, 336 (6th Cir. 2003). An equivalent position is one that provides, *inter alia*, the same rate of pay. *See, e.g.*, *McLean v. Runyon*, 222 F.3d 1150, 1154 (9th Cir. 2000); *Petty v. Freightliner Corp.,* 113 F. Supp. 2d 808, 810 (W.D.N.C. 2000); *Williams v. Channel Master Satellite Sys.,* 101 F.3d 346, 350 (4th Cir. 1996)("the

---

reviewed the Superintendent's recommendation . . ." but does not state that the recommendation was accepted. *Id.* Mr. Adams is employed 12 months of the year, and the lack of start date on the letter meant that Mr. Adams was still awaiting an official accommodation. In fact, he was not actually transferred until AACPS required him to attend *three psychiatric evaluations* in order to determine he was fit to return to work, despite already providing medical evidence from his own psychiatrist of his fitness for duty with a reasonable accommodation. Statement of Facts, Section III A.12; J.A. at 554. As a result, the transfer did not actually occur until August 2010. AACPS could have sent Mr. Adams to another school following its medical evaluations of him, but it chose not to do so.

standard of 'reasonableness' is empty if 'reasonable' means only 'the employer's opinion.'").

Thus, an employer considering a reassignment should look for an available position that provides equivalent pay. AACPS failed to fulfill this requirement. Mr. Liverman testified that he made the decision to transfer Mr. Adams to JAA Academy. J.A. at 556. Mr. Liverman made no effort to see if there was an equivalent position available, and did not consider Mr. Adams' salary or attempt to find a reassignment that would not affect Mr. Adams' pay. J.A. at 556; 559-60; 576. Mr. Liverman testified that although other schools may have been available for Mr. Adams' reassignment, he did not investigate other options. J.A. at 560.

In addition, there is a genuine dispute of material fact as to whether JAA Academy was even a lower-stress environment. *See* J.A. at 322-23; 364-66; Statement of Facts, Section III A.13, *supra*. JAA Academy is an "alternative" middle school for children with behavior problems. J.A. at 321; 518-19; 561-62. The majority of its students are there because they had or were about to have disciplinary problems at their last school, including expulsion, extended suspensions, and chronic disciplinary issues. *Id.* Mr. Adams testified that JAA Academy is most definitely not a lower-stress environment and is at least as stressful as MacArthur Middle School. J.A. at 322-23. Since Mr. Adams has been at JAA Academy, one student threatened to hit him and another student threatened

that he would get Mr. Adams shot.  J.A. at 364-66.  In both cases, the investigators and the principal recommended an extended suspension, but AACPS decided not to grant the principal's request for extended suspension  and allowed the students to stay at the school to continue their education.  *Id.*

Moreover, the decision-makers regarding the reassignment were Mr. Liverman and ECM – even though Mr. Liverman admitted that such decisions were the purview of Human Resources ("HR").  J.A. at 551; 555-56.  He testified that ECM discussed Mr. Adams' request for a transfer to a less stressful environment as an accommodation despite the fact that ECM has no responsibilities with regard to accommodation requests.  J.A. at 550-51.  Mr. Liverman also admitted the "mention of a doctor" during ECM discussions of Mr. Adams.  J.A. at 542.  There is no legitimate reason for Mr. Liverman and ECM to discuss and make decisions regarding Mr. Adams' disability and request for accommodation.  Mr. Liverman's usurpation of HR's role in considering Mr. Adams' reassignment is further evidence of discriminatory animus against Mr. Adams.

Mr. Adams has established a genuine dispute of material fact regarding AACPS' alleged failure to accommodate his disability, and therefore AACPS is not entitled to summary judgment as a matter of law with respect to Counts II and IV.

3.    **There are Triable Facts Capable of Proving AACPS Retaliated Against Mr. Adams based on his Disability, as Alleged in Counts II and IV of the Second Amended Complaint.**

Finally, to establish retaliation under the ADA, a plaintiff must plead facts showing: 1) the plaintiff engaged in protected activity under the ADA; 2) the plaintiff suffered an adverse employment action; and 3) the adverse employment action was causally connected to the plaintiff's protected activity. *Rhoads v. F.D.I.C.*, 257 F. 3d 373, 392 (4th Cir. 2001). The standard for an adverse employment action under a theory of retaliation is "less strenuous" than that in a discrimination context. *Brockman v. Snow*, 217 Fed. Appx. 201, 206 n.2 (4th Cir. 2006) (citing *Burlington Northern*, 548 U.S. at 53). For many of the same reasons discussed above regarding Mr. Adams' claim of retaliation under the FMLA, AACPS has retaliated against Mr. Adams for his request for a reasonable accommodation. Namely, the written reprimand, medical examinations, and reduction in salary and bonuses all constitute retaliatory adverse employment actions under the ADA. All of these actions occurred subsequent to Mr. Adams' request for reasonable accommodation, and this is sufficient evidence to infer that the actions were in retaliation for Mr. Adams' request.

## VI.  <u>Conclusion</u>

Appellant respectfully requests that this Honorable Court vacate the district court's grant of summary judgment against him.

Respectfully submitted,

RIFKIN, WEINER, LIVINGSTON,
LEVITAN & SILVER, LLC


*/s/*
_____
Joyce E. Smithey, Esq.
Federal Bar No. 27531
225 Duke of Gloucester Street
Annapolis, Maryland  21401
(410) 269-5066 (Phone)
(410) 269-1235 (Fax)
jsmithey@rwlls.com


## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 12,686 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief has been prepared in a proportionally spaced font, Times New Roman, 14 point, Microsoft Word.

This the 14th day of October, 2014.

*/s/*
_____
Joyce E. Smithey, Esq.

## Certificate of Service

I hereby certify that the required copies of the foregoing Opening Brief of Appellant were filed with the Clerk, United States Court of Appeals via hand delivery and electronically using the Court's CM/ECF system, which sends notification of such filing to the following:

COUNSEL SERVED ECF:

Jay Creech
ANNE ARUNDEL COUNTY
OFFICE OF LAW
2660 Riva Road, 4th Floor
P.O. Box 6675
Annapolis, MD 21401
(410) 222-4485
jay.creech@aacounty.org

Counsel for Appellee
Anne Arundel County Public Schools

This the 14th day of October, 2014.

/s/
_____
May Serafim
Lantagne Legal Printing
801 East Main Street, Suite 100
Richmond, Virginia 23219
(804) 644-0477